**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ALEXIS HUNLEY, VANESSA CHARLOT,** ) | |
| **DEE DWYER, KARISHA "KAY"** ) | |
| **HICKMAN, ANTHONY "TONY" MOBLEY,** ) | |
| **and MONTINIQUE MONROE,** ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| **v.** ) | |
| ) | |
| **BUZZFEED, INC.** ) | |
| | |
| *Defendant.* | |

## COMPLAINT

Plaintiffs, by and through their undersigned attorneys, pray to this honorable Court for relief as follows:

## I.  INTRODUCTION

1.      This is a case about six (6) black photojournalists who risked life and limb while covering the historic protests during May and June 2020 caused in part from the death of George Floyd. Instead of these black photojournalists being fully and fairly compensated for licensing of their photos captured on the frontlines of those nationwide protests, BuzzFeed stole Plaintiffs' photos, ironically celebrating its heist in an online post titled "17 Powerful Pictures Of The Protests Through The Eyes Of Black Photographers."[1]  BuzzFeed never secured a license or paid any of the Plaintiff photojournalists for permission to embed and display their photos. BuzzFeed later confessed that "This post has been updated and several photographs were removed because the original list did not meet our editorial standards regarding photo permissions."

---

[1] https://www.buzzfeednews.com/article/gabrielsanchez/powerful-pictures-protest-black-photographers-instagram

2.      This complaint arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101 et. seq. (the "Copyright Act").

3.      Each Plaintiff separately alleges Defendant BuzzFeed, Inc. is liable for direct and willful copyright infringement of Plaintiffs' respective photographs in violation of 17 U.S.C. §§ 106 and 501.

## II. PARTIES

4.      Plaintiff Alexis Hunley ("Hunley" or "Plaintiff Hunley") is a resident and domiciled in the state of California.

5.      Plaintiff Vanessa Charlot ("Charlot" or "Plaintiff Charlot") is a resident and domiciled in the state of Missouri.

6.      Plaintiff Dee Dwyer ("Dwyer" or "Plaintiff Dwyer") is a resident and domiciled in the District of Columbia.

7.      Plaintiff Karisha "Kay" Hickman ("Hickman" or "Plaintiff Hickman") is a resident and domiciled in the state of New York.

8.      Plaintiff Anthony "Tony" Mobley ("Mobley" or "Plaintiff Mobley") is a resident and domiciled in the state of Maryland.

9.      Plaintiff Montinique Monroe ("Monroe" or "Plaintiff Monroe") is a resident and domiciled in the state of Texas.

10.      Defendant BuzzFeed, Inc. ("Defendant" or  "BuzzFeed") is and was at all relevant times a corporation formed in Delaware and authorized to operate in New York (NY DOS ID# 3687271), with its principal place of business at 111 E. 18th Street 13th Floor New York, New York 10003.  Defendant operates a commercial website that was created to share viral content under the trade name "BuzzFeed" at the domain address, www.buzzfeed.com.

### III. JURISDICTION AND VENUE

11.     This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (copyrights).

12.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§ 1391 because Defendant's principle place of business can be found in this District.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright cases) because Defendant may be found in this District.

13.     This Court has *in personam* jurisdiction over Defendant because Defendant availed itself of the privileges of conducting business in this district and the State of New York and incurred a benefit from the copyright infringements, thus it is reasonable for Defendant to submit to the jurisdiction of this New York federal district court.

### IV. FACTUAL ALLEGATIONS

14.     On May 25, 2020, George Floyd, a black resident of Minneapolis, Minnesota, died while in police custody.  A witness captured video of the event showing Mr. Floyd pleading for his life before finally succumbing to the officer's deadly force. The video footage of Floyd dying at the hands of police while crying "I can't breathe" was widely circulated in the media the next day and almost immediately touched off nationwide protests (the "Protests"), motivating each Plaintiff photographer to spring into action and cover the aftermath of this tragic event and the Protests.

15.     As the Protests sprung up in nearly every major city in the United States, some protests grew violent and confrontational with the police. During this time, police in various

jurisdictions began targeting journalists with brute force and weaponry despite clear notices on their persons indicating their status as members of the press.[2]

16.     Each Plaintiff, as photojournalists of color, covered the Protests on the front lines in Los Angeles, St. Louis, Austin, Washington, DC, and New York City.

17.     Each Plaintiff captured frontline photographs of the Protests and subjected themselves to physical harm from the police and counter-protestors, risking their safety.

18.     Each Plaintiff also earns a living, in part, through licensing fees they earn for capturing photographs of events such as the Protests.

19.     As is described below, each Plaintiff suffered copyright infringement of their respective photographs by Defendant BuzzFeed, which celebrated these black journalists with an online Post that generated profits for this company, but affirmatively chose not to seek a license and compensate any of the Plaintiffs for their work.

### A.  Plaintiff Alexis Hunley

20.     Plaintiff Hunley is an African American photojournalist, videographer, and artist based in Los Angeles whose work focuses on emotionally compelling stories that contemplate race, community, gender, sexuality, and power in America.

---

[2] See, for example, "Journalists blinded, injured, arrested covering George Floyd protests nationwide," by Lorenzo Reyes, USA Today, May 31, 2020, available at: https://www.usatoday.com/story/news/nation/2020/05/31/journalists-blinded-injured-arrested-covering-george-floyd-protests/5299374002/; see also, for example, "'The norms have broken down': Shock as journalists are arrested, injured by police while trying to cover the story," by Paul Farhi and Elahe Izadi, May 31, 2020, available at: https://www.washingtonpost.com/lifestyle/media/journalists-at-several-protests-were-injured-arrested-by-police-while-trying-to-cover-the-story/2020/05/31/bfbc322a-a342-11ea-b619-3f9133bbb482_story.html.

21. Plaintiff Hunley's work has been published by Rolling Stone, Wired Magazine, NY Times, Men's Health, Financial Times, NBC and Time.

22. Plaintiff Hunley owns and maintains a publicly-searchable website (www.AlexisHunley.com) to showcase her photos and provide her contact information to potential licensees. The fees collected from licensing constitute a meaningful portion of Plaintiff Hunley's income.

23. Plaintiff Hunley put her physical safety and life in danger when covering the Protests, not only due to the violent, excessive force used by law enforcement officers, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus, particularly as both her and her family are genetically immunocompromised and are susceptible to more severe reactions to infection from COVID-19.

24. While covering the Protests, Plaintiff Hunley witnessed law enforcement officers shoot peaceful activists with rubber bullets at point blank range, beat them with batons, pepper spray them in the face, fire tear gas rounds at their heads from close distances, kettle protestors together onto crowded busses in the midst of a deadly pandemic, and, on one occasion, run over a protestor, delivering a major head wound; and she has, on more than one occasion, had to flee for her life to avoid being run over by automobiles, shot, or detained by both law enforcement officers and white supremacist counter-protestors, who she feels appear to have been given wide latitude by law enforcement officers to arrest and attack protestors and journalists alike.

25. Plaintiff Hunley believes she developed significant anxiety and post-traumatic stress disorder as a result of covering the Protests, which has negatively impacted her sleep, physical wellbeing, and personal relationships.

26.     Plaintiff Hunley has nevertheless continued to cover the Protests despite the risks she perceived because she feels compelled, as both a professional journalist and an African American, to document the historic events, and has an expectation of being fairly compensated for her photographs.

27.     Plaintiff Hunley has and continues to license photographs and videos taken at the Protests as part of her means to make a living as a photojournalist.

### B. Plaintiff Vanessa Charlot

28.     Plaintiff Charlot is a Haitian American freelance photojournalist, lecturer, and U.S. Army veteran, whose work focuses on the intersectionality of spirituality, socio-economic issues, and sexual/gender expression.

29.     Plaintiff Charlot has worked throughout the U.S., Caribbean, and Southeast Asia and has published her photography in Vogue, The New Yorker, The Atlantic, New York Magazine, BuzzFeed, Artnet News among other national and international publications.

30.     Plaintiff Charlot owns and maintains a publicly-searchable website (www.VanessaCharlot.com) to showcase her photos and invite offers from potential licensees. The fees collected from this licensing constitute a meaningful portion of Plaintiff's income.

31.     Despite possessing journalistic and military training, Plaintiff Charlot believes that covering the Protests put her physical safety and life in danger, not only due to the violent excessive force used by law enforcement officers, national guard troops, and other unmarked federal agents, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus.

32.     While covering the Protests, Plaintiff Charlot was repeatedly tear gassed by the police; repeatedly witnessed the police injure nearby protestors who were in the act of retreating;

witnessed one police officer shoot a nearby protestor in the leg shortly before several other officers set upon the injured and helpless man with their batons; was physically and verbally harassed by members of the white supremacist club, the Proud Boys, who threatened to ram their pick-up trucks into her and others while shouting racial epithets at them; was among the crowd of protestors who, while airing grievances outside the home of St. Louis mayor Lyda Krewson's home, were targeted by now-infamous firearm-brandishing lawyer spouses, Mark and Patricia McCloskey.[3]

33.     Plaintiff Charlot believes she developed significant anxiety and post-traumatic stress disorder as a result of covering the Protests, which has negatively impacted her sleep, physical wellbeing, and personal relationships.

34.     Plaintiff Charlot has nevertheless continued to cover the Protests because, as a professional journalist and Haitian American, she sensed their historic importance, and had an expectation of being fairly compensated for her photographs.

35.     Plaintiff Charlot has and continues to license photographs and videos taken at the Protests as part of her means to make a living as a photojournalist.

### C. Plaintiff Dee Dwyer

36.     Plaintiff Dwyer is an African American freelance photojournalist, teacher, lecturer, and mother from Washington D.C. whose work focuses on both the beauty and the struggle of socially and economically disadvantaged populations.

37.     Plaintiff Dwyer's work has been exhibited in numerous galleries throughout the United States and published by a variety of entities such as the Black Entertainment Television

---

[3] See: https://www.stltoday.com/news/local/metro/the-st-louis-couple-charged-with-waving-guns-at-protesters-have-a-long-history-of/article_281d9989-373e-53c3-abcb-ecd0225dd287.html

(BET) Network, the Daily Mail, Metro UK, W Magazine, Harper's Bazaar, Yahoo! Life Magazine, and Allure.

38.     Plaintiff Dwyer owns and maintains a publicly-searchable website (www.DeeDwyerJonts.com) to showcase her images and invite offers from potential licensees. The fees collected from this licensing constitute a sizable portion of Plaintiff's income.

39.     Plaintiff Dwyer covered the Protests and put her physical safety and life in danger, not only due to the violent excessive force used by law enforcement officers, national guard troops, and other unmarked federal agents, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus.

40.     Plaintiff Dwyer believes she developed significant anxiety and post-traumatic stress disorder because of covering the Protests, which has negatively impacted her sleep, physical wellbeing, and personal relationships.

41.     Plaintiff Dwyer has nevertheless continued to cover the Protests because she felt compelled, as both a professional journalist and an African American, to document the historic events and has an expectation of being fairly compensated for her photographs.

42.     Plaintiff Dwyer has and continues to license photographs and videos taken at the Protests as part of her means to make a living as a photojournalist.

**D. Plaintiff Karisha "Kay" Hickman**

43.     Plaintiff Hickman is an African American freelance photojournalist from New York City focused on documenting the variety of African diaspora in America.

44.     Plaintiff Hickman's work has been published in Time Magazine, the New York Times, Vogue, Ms. Magazine, Vibe, Coeval Magazine, Jazz Halo, and the photographic journal

MFON: Women Photographers of the African Diaspora, and has been featured by the U.S. Department of State as a part of its "Art in Embassies" project.

45.     Plaintiff Hickman owns and maintains a publicly-searchable website (www.KHickmanPhotography.com)  to showcase her images and invites offers from potential licensees.  The fees collected from this licensing constitute a meaningful portion of Plaintiff's income.

46.     Plaintiff Hickman covered the Protests and put her physical safety and life in danger, not only due to the violent excessive force used by law enforcement officers, national guard troops, and other unmarked federal agents, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus, particularly given that New York City was the epicenter of the pandemic in the U.S. around the time the protests began.

47.     Plaintiff Hickman believes she developed significant anxiety and post-traumatic stress disorder as a result of covering the Protests, which has negatively impacted her sleep, physical wellbeing, and personal relationships.

48.     Plaintiff Hickman has nevertheless continued to cover the Protests despite the risks because she felt compelled, as both a professional journalist and an African American, to document the historic events and has an expectation of being fairly compensated for her photographs.

49.     Plaintiff Hickman has and continues to license photographs and videos taken at the Protests as part of her means to make a living as a photojournalist.

///

///

**E. Plaintiff Anthony "Tony" Mobley**

50.    Plaintiff Mobley is an African American freelance photojournalist and U.S. Navy veteran whose work focuses on portraiture and documenting narratives of social justice and activism as they unfold in his community and beyond.

51.    Plaintiff Mobley works in the greater Washington, D.C. area and has published his work in entities such as Vogue, BuzzFeed, and on the BET Network, and has been the resident photographer for the historic Howard Theater.

52.    Plaintiff Mobley owns and maintains a publicly-searchable website (www.TonyMobley.com) to showcase his images and invite offers from potential licensees.  The fees collected from this licensing constitute a meaningful portion of Plaintiff's income.

53.    Despite possessing journalistic and military training, Plaintiff Mobley covered the Protests and put his physical safety and life in danger, not only due to the violent excessive force used by law enforcement officers, national guard troops, and other unmarked federal agents, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus.

54.    Plaintiff Mobley believes he developed significant anxiety and post-traumatic stress disorder because of covering the Protests, which has negatively impacted his sleep, physical wellbeing, and personal relationships.

55.    Plaintiff Mobley has nevertheless continued to cover the Protests despite the risks because he felt compelled, as both a professional journalist and an African American, to document the historic events and has an expectation of being fairly compensated for his photographs.

10

56.     Plaintiff Mobley has and continues to license photographs and videos taken at the Protests as part of his means to make a living as a photojournalist.

### F. Plaintiff Martinique Monroe

57.     Plaintiff Monroe is an African American freelance photojournalist whose work has focused on legalization and regulation of marijuana in the U.S., migrant family reunification, local and state elections, the Texas mass church shooting, police violence and its effect on the families of victims and the myriad of social and economic issues faced by black communities.

58.     Plaintiff Monroe works out of Austin, Texas and has published her work in the Washington Post, NY Times, NPR, ABC News, Al Jazeera, the Texas Tribune, Vox, Time (https://time.com/5896830/texas-police-officer-murder-jonathan-price-shooting/.)

59.     Plaintiff Monroe owns and maintains a publicly-searchable website (www.Montinique.com)  to showcase her images and invites offers from potential licensees.  The fees collected from this licensing constitute a meaningful portion of Plaintiff's income.

60.     Plaintiff Monroe believes that covering the Protests put her physical safety and life in danger, not only due to the violent excessive force used by law enforcement officers, national guard troops, and other unmarked federal agents, but also due to the threat of violent force from counter-protestors and the overarching threat of exposure to the deadly COVID-19 virus.

61.     While covering the protests, Plaintiff Monroe repeatedly witnessed law enforcement officers fire tear gas canisters at protestors, shoot them with rubber bullets, and was generally in the line of fire with covering the Protests.

62.     Plaintiff Monroe believes she continues to suffer anxiety and post-traumatic stress because of covering the Protests especially in light of events that occurred earlier in life with her father being killed by the police.

63.     Nevertheless, she continued to covered the Protests despite the risks she perceived because she felt compelled, as both a professional journalist and as the daughter of a black man who was killed by police to document the historic events.

64.     Plaintiff Monroe has and continues to license photographs taken at the Protests as part of her means to make a living as a photojournalist.

### G. Defendant BuzzFeed Inc.

65.     Defendant BuzzFeed is in the business of publishing audiovisual content on its flagship website, www.buzzfeed.com, and other media properties and social media channels.

66.     Founded in 2006, BuzzFeed tracks viral content across the internet, however, with the launch of www.buzzfeed.com, its mission changed to creating the viral content it previously only reported on as a means of generating advertising revenue.

67.     Even as BuzzFeed's business model enjoyed increasing success and it began to focus some of its resources on actual legitimate news reporting, it was, and still is commonly known as a "click bait" factory due to the sheer volume of content it publishes to feed the internet's never ending appetite for low-stakes, easy-to-digest material like the "listicle," a pejorative term for content that purports to give the viewer a truncated version of the contents of a traditional magazine article in the form of a list embedded with photographs.

68.     Several years of growth under this model has resulted in Defendant BuzzFeed's flagship website, www.buzzfeed.com, currently garnering billions of monthly page views ("BuzzFeed had more than 1.2B pageviews across its [owned and operated] websites during the

month of March [2020]"). See https://www.buzzfeed.com/buzzfeedpress/buzzfeed-traffic-update.

69.     But recently, Defendant BuzzFeed's primary outlet is social media.  As noted on www.buzzfeed.com's "About BuzzFeed" page, Defendant BuzzFeed reaches "hundreds of millions of people around the world" through a global, cross-platform network that includes a variety of social media platforms and channels, each showcasing BuzzFeed branded content.[4] For example, Defendant BuzzFeed maintains dozens of incarnations on the Facebook platform alone, including: "BuzzFeed" with over thirteen (13) million followers; "BuzzFeed Video" with over fourteen (14) million followers; and "BuzzFeed Food" with nearly twenty-three (23) million followers.  Defendant BuzzFeed's similarly multi-faceted presence on the iconic video-hosting platform YouTube also draws eye-popping numbers, including: "BuzzFeedVideo" with over twenty (20) million subscribers; "BuzzFeed Tasty" with over nineteen (19) million subscribers; and "BuzzFeed Celeb" with nearly three (3) million subscribers.

70.     Upon information and belief, Defendant BuzzFeed generates revenue through advertisements and promotional placements on its website and global cross-platform social media accounts; and as web traffic and download rates across these platforms increase, BuzzFeed is able to charge advertisers higher rates for placing advertisements in front of BuzzFeed's millions of followers, subscribers, downloaders, and casual viewers.

71.     Along with its successes, Defendant BuzzFeed is no stranger to being found liable for copyright infringements, with at least four judgments entered against it in the last year alone including:

---

[4] *See*: https://www.buzzfeed.com/about

    a.   *Seidman v. BuzzFeed* (SDNY 19-cv-05342), judgment entered against Defendant BuzzFeed on 12/6/19

    b.   *Fortune v. BuzzFeed* (SDNY 19-cv-06464), judgment entered against Defendant BuzzFeed on 9/27/19

    c.   *Zlozower v. BuzzFeed* (SDNY 19-cv-02952), judgment entered against Defendant BuzzFeed on 9/27/19

    d.   *Mango v. BuzzFeed* (SDNY 17-cv-06784), judgment entered against Defendant BuzzFeed on 8/22/2019; affirmed on appeal.

72.    On August 13, 2020, the United States Court of Appeals for the Second Circuit upheld a Southern District of New York trial court judgment that awarded Plaintiff Mango $3,750 in statutory damages for copyright infringement, $5,000 in statutory damages for violation of the DMCA, and attorney's fees of $65,132.50 and $1,810.03 in costs.

73.    The *Mango* case is an example of Defendant's prior copyright infringement and circumstantial evidence of BuzzFeed's willfulness in this case.  vidence of willful or intentional misconduct by BuzzFeed not only establishes enhanced damages to Plaintiffs but can establish the right to attorneys' fees per the court's discretion. See, 17 U.S.C. §505; *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1988-89 (2016) (court may order fees, even when the losing party had reasonable arguments, because of a party's litigation misconduct or to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims); *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1230 (7th Cir. 1991)("[A] finding of willful infringement will support an award of attorney's fees."); *St. Talk Tunes v. Vacaville Recreation Corp.*, 2006 WL 2423429, at 2-3 (E.D. Cal. Apr. 19, 2006) (same); *Beastie Boys v. Monster*

*Energy Co.*, 112 F. Supp. 3d 31, 43 (S.D.N.Y. 2015) ("Courts have awarded fees based on willfulness even where the infringement was reckless rather than knowing.").

74.     Numerous courts have held that prior lawsuits and settlements for copyright infringement support a finding of willfulness. See, e.g., *Stevens v. Aeonian Press, Inc.*, 2002 WL 31387224, at 3 (S.D.N.Y. Oct. 23, 2002)(finding willful infringement included "records of other lawsuits filed against Defendants for similar activities, and a settlement entered into with respect to one such action").

### H. BuzzFeed Infringes on Plaintiffs' Copyrighted Photos

75.     On or about June 3, 2020, Defendant BuzzFeed published an online post (the "Post") with the headline: "17 Powerful Pictures Of The Protests Through The Eyes Of Black Photographers." Attached as Exhibit A.  For reasons discussed below, the headline was subsequently changed to, and currently reads: "Here Are Powerful Pictures Of The Protests Through The Eyes Of Black Photographers." At all times, the Post has been available at buzzfeednews.com/article/gabrielsanchez/powerful-pictures-protest-black-photographers-instagram.

76.     BuzzFeed's wrongful acts and the facts surrounding such conduct are generally common to all Plaintiffs. Therefore, Plaintiff join this complaint as the most efficient means for the court to hear this dispute, and all parties involved because the liability alleged generally is caused by the same transaction, occurrence, or series of transactions or occurrences, i.e. the Post. The only difference for each Plaintiff may be the amount of damages.

77.     Defendant BuzzFeed caused at least one photo owned by each Plaintiff to be displayed in the Post (via the Instagram API, described below) without attempting to secure a

valid license or permission from each Plaintiff or a valid legal defense.  BuzzFeed also admitted to its wrongdoing from the Post.

78.     Prior to being improperly embedded and displayed by Defendant BuzzFeed in the Post, Plaintiffs' photos were first posted and displayed on the respective Plaintiffs' public Instagram accounts. Each Plaintiff maintains the copyright interest in her or his photo and each Plaintiff timely registered each photo with the US Copyright office.

79.     Defendant BuzzFeed accomplished its unauthorized display of Plaintiffs' photos by inserting the unique computer code attached to each of Plaintiffs' photos on their respective Instagram accounts, generally referred to as Instagram's API ("application programming interface") code, in the Post causing each photo to simultaneously be displayed within the body of the Post without the need for the Post's viewers to take additional action or navigate their web browser away from the Post to the respective Instagram accounts of Plaintiffs. In other words, a viewer of the Post likely did not even know that the Photos displayed in the body of the Post were "embedded" into the Post and the actual photo file was stored on Instagram's server.[5]

80.     To a viewer of the Post, content embedded from an Instagram account appears no differently than other content within the Post, be it an advertisement, clickable link, or BuzzFeed's original and/or owned or licensed content. A BuzzFeed viewer does not need to be an Instagram user or have an Instagram account to view Instagram photos embedded within any BuzzFeed post including the one at issue.

81.     All Instagram account holders, including Plaintiffs, allegedly agree to Instagram's Terms of Use in order to initially open their account and maintain that account for use on the Instagram platform.  Pursuant to Instagram's Terms of Use, Instagram users still retain

---

[5] Upon information and belief, Instagram's default format for images is JPEG (.jpg), meaning that any image that is uploaded in PNG (.png), BITMAP (.bmp).

ownership of their copyrighted photos and videos that are posted to their Instagram accounts. However, each user agrees to grant Instagram a nonexclusive license to the content the user posts to their Instagram account, including any copyrighted photos or videos, which, in turn, provides Instagram permission to license, or sublicense, those copyrighted photos should Instagram elect to do so.[6]  There is no evidence that Instagram granted BuzzFeed a license to any of the photos at issue.

82.     Further, users, such BuzzFeed of Instagram's API embedding code agree to be bound by an additional set of rules contained within Instagram's Platform Policy.[7] Notably, the Platform Policy contains no language that provides API users such as BuzzFeed a license or sub-license to freely use, display, publish, or even embed the photos of users such as Plaintiffs without first ensuring that BuzzFeed received "all rights necessary to display the content of general Instagram users."[8]

83.     Non-party Facebook Inc., who owns and controls its subsidiary, Instagram, LLC, publicly confirmed that Instagram's Platform Policy does not give API users, such as BuzzFeed, a license or sub-license to use and display the content of Instagram's general user population:

> **"While our terms allow us to grant a sub-license, we do not grant one for our embeds API. Our platform policies require third parties [such as BuzzFeed] to have the necessary rights from applicable rights holders. This includes ensuring they have a license to share this content, if a license is required by law."**[9]

84.     The day after Facebook confirmed its position, a position that has been presumably in existence since 2012, it is without dispute that BuzzFeed knew or should have

---

[6] See Instagram Terms of Use.
[7] See Instagram Platform Policy.
[8] See Instagram Platform Policy at D-9.
[9] Timothy B. Lee, *Instagram just threw users of its embedding service under the bus*, Ars Technica, June 4, 2020. Available at: https://arstechnica.com/tech-policy/2020/06/instagram-just-threw-users-of-its-embedding-api-under-the-bus/.

known that it was required by the Copyright Act and by Instagram's Platform Policy (confirmed by Facebook) that BuzzFeed needed to obtain a license from Plaintiffs before embedding each of the photos into the Post.

85.     BuzzFeed failed to obtain a license for any of Plaintiffs' respective copyrighted photos.

86.     On or about June 6, 2020, Plaintiff Hunley contacted BuzzFeed through its editor, Gabriel Sanchez, an employee and/or agent of BuzzFeed via email to inform BuzzFeed that it had no right to use her photo without her permission:

> "**You [BuzzFeed] used one of my images in your recent article about the protests and I wanted to reach out. I woke up to a text from a friend with a link to the article and was shocked because I had never received as much as an email or DM from you or anybody at BuzzFeed asking for permission to embed my image. It's disappointing that no attempt was made to contact me or even offer a licensing fee especially as a Black photographer covering protests regarding the lives of Black people**."

87.     BuzzFeed responded with an after-the-fact offer of $75.00 to compensate Plaintiff Hunley for the display of her photo in the Post.

88.     Hunley never accepted BuzzFeed's after-the-fact offer to license her photo.

89.     On June 9, 2020, BuzzFeed employee, Gabriel Sanchez, attempted to communicate with each Plaintiff, except for Plaintiff Hunley.  In this communication, Mr. Sanchez announced BuzzFeed's use of each of Plaintiffs' photos.  BuzzFeed did not seek Plaintiffs' permission for each use. Instead, BuzzFeed chose to avoid securing a license and paying Plaintiffs an agreed-upon licensing fee.

90.     Instead, BuzzFeed stole Plaintiffs' respective photos by using the Instagram API tool to "embed" the photos in the Post.  This despite Instagram's public position regarding licensing, the use of the API, and at least one court ruling in the Southern District of New York

in *McGucken v. Newsweek LLC et. al.*, No. 1:2019cv09617 - Doc. 35 (S.D.N.Y. June 1, 2020) putting BuzzFeed on notice.  Notably and not a coincidence, Cowan, DeBaets, Abrahams & Sheppard is a law firm that represented BuzzFeed on the aforementioned *Mango* case and is the very same firm that represents Newsweek on the *McGucken* case that yielded a court ruling generally confirming Instagram's position regarding the need to secure a license when using its API, which BuzzFeed failed to do.

91.     Between June 11 and 13, 2020, more than a week after the Post was first published on buzzfeed.com, Gabriel Sanchez then attempted to contact each Plaintiff photographer, with the exception of Plaintiff Hunley, to notify each of them that their photos had been removed from being displayed within the Post but could be "reincluded in the story," or to better reframe this *mea culp*a: the photo could be displayed again if the photographer agreed.

92.     No Plaintiff photographer agreed.

93.     At or around this time, BuzzFeed also changed the Post's headline to its current iteration and discontinued the display of all of Plaintiffs' respective photos in the Post, with the exception of Plaintiff Charlot's, which, at the time of this complaint continues to appear in the original, US-based version of the Post despite numerous demands to take it down. BuzzFeed has refused to share proof of a license regarding the use of the photo in the Post. BuzzFeed, however, continued to display all of Plaintiffs' photos on international versions of the Post[10] until at or about August 1, 2020, Defendant BuzzFeed's received Plaintiffs' DMCA-compliant infringement notice.

94.     The Post is attached as Exhibit A.

---

[10] See, for example, https://www.buzzfeed.com/br/gabrielsanchez/fotos-protestos-eua-fotografos-negros

95.     Plaintiff Hunley's photo is attached as Exhibit "B1" and a screenshot of the U.S. Copyright Office's copyright registration listing for this photo is attached as Exhibit "B2" and bears an Effective Date of June 6, 2020 and Registration number VA-220-9860.

96.     Plaintiff Charlot's photo is attached as Exhibit "C1" and a screenshot of the U.S. Copyright Office's copyright registration listing for this photo is attached as Exhibit "C2" and bears an Effective Date of June 7, 2020 and Registration number VA-220-9862.

97.     Plaintiff Dwyer's photo is attached as Exhibit "D1" and the copyright registration for this photo is attached as Exhibit "D2" and bears an Effective Date of July 13, 2020 and Registration number VAu-401-757.

98.     Plaintiff Hickman's photo is attached as Exhibit "E1" and the copyright registration for this photo is attached as Exhibit "E2" and bears an Effective Date of July 2, 2020 and Registration number VAu-400-477.

99.     Plaintiff Mobley's photo is attached as Exhibit "F1" and the copyright registration for this photo is attached as Exhibit "F2" and bears an Effective Date of July 10, 2020 and Registration number VAu-1-401-397.

100.    Plaintiff Monroe's photo is attached as Exhibit "G1" and the copyright registration for this photo is attached as Exhibit "G2" and bears an Effective Date of July 2, 2020 and Registration number VAu-1-400-478.

101.    Plaintiffs sent BuzzFeed written notice that it had willfully infringed on their respective photos on or about July 31, 2020.

102.    Defendant BuzzFeed has, however, refused to offer just compensation to Plaintiffs for the copyright infringement of their photos even though BuzzFeed admits that the

display of the photos "did not meet our editorial standards regarding photo permissions," leaving Plaintiffs no choice but to file this Complaint.

## V. ALLEGATIONS

### COUNT 1: INFRINGEMENT OF COPYRIGHTS (17 U.S.C. §§ 106, 501)

### (ALL PLAINTIFFS AGAINST DEFENDANT BUZZFEED)

103.    Plaintiffs incorporate herein by this reference each and every allegation contained in each paragraph above.

104.    Plaintiffs are each, and at all relevant times have been, the respective copyright owners or licensees of exclusive rights under United States copyright with respect to certain copyrighted photographs identified in Exhibits A (the Post), B1, B2, C1, C2, D1, D2, E1, E2, G1 and G2 (the photos and the copyright registrations).

105.    Among the exclusive rights granted to each of the six (6) Plaintiffs under the Copyright Act are the exclusive rights to reproduce their respective copyrighted photos and to distribute the copyrighted photos to the public.

106.    Defendant BuzzFeed, without the permission, license, or consent of each of the six (6) Plaintiffs, embedded a single copyrighted photo to Defendant's website using the Instagram API, causing the photos to be displayed and distributing the photos to the public and/or making the copyrighted photos available for distribution to others through Defendant's website, buzzfeed.com.

107.    Defendant has violated Plaintiffs' exclusive rights of reproduction and distribution of their respective photos.

///

///

108.    Defendant never sought permission nor secured a license for the right to embed or display Plaintiffs' copyrighted photos despite Plaintiffs each operating publicly available websites for the specific purpose of inviting offers from potential licensors such as BuzzFeed.

109.    Plaintiffs are also informed and believe that the foregoing acts of infringement have been willful and intentional or reckless, in total disregard of and with indifference to the rights to Plaintiffs' copyrights and exclusive rights under copyright, especially in light of Defendant BuzzFeed's reputation as a serial copyright infringer which creates that presumption of enhanced damages and in light of Facebook's position and the *McGrucken v. Newsweek* decision having the commonality of the same law firm representing BuzzFeed and the Newsweek in that case.

110.    As a result of Defendant's infringements of Plaintiffs' copyrights and exclusive rights under copyright, Plaintiffs are entitled to statutory damages pursuant to 17 U.S.C. § 504(c) for Defendant's infringement of the Copyrighted photos or alternatively to elect to pursue actual damages based on what Defendant earned from the Post and savings from the avoidance of paying licensing fees.

111.    Plaintiffs further are entitled to attorney's fees and costs pursuant to 17 U.S.C. § 505.

112.    In the event the photos are still posted or associated with Defendant, the conduct of Defendant is causing and, unless enjoined and restrained by this Court, will continue to cause Plaintiffs irreparable injury that cannot fully be compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiffs are entitled to injunctive relief prohibiting Defendant from further infringing Plaintiffs' copyrights, and

ordering Defendant to destroy all copies of images made or used in violation of Plaintiffs'

exclusive rights and to remove images from any site or blog that Defendant controls or owns.

## VI. DAMAGES

113.     Defendant's conduct caused actual damages and/or is liable for statutory damages

of up to $30,000.00 for each infringement or alternatively up to $150,000.00 for each willful

infringement pursuant to 17 U.S.C. § 504.

## VII. JURY TRIAL DEMANDED

114.     Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs respectfully demand a trial by jury of

all the claims asserted in this Complaint so triable.

## VIII. RELIEF REQUESTED

115.     WHEREFORE, Plaintiffs respectfully request that the Court enter judgment on

their behalf adjudging and decreeing that:

A.     For an injunction providing: "Defendant shall be and hereby is enjoined from

directly or indirectly infringing Plaintiffs' rights under federal or state law in the

Copyrighted photos, whether now in existence or later created, that is owned or

controlled by Plaintiffs ("Plaintiffs' photos"), including without limitation by

using the Internet, the Instagram embedding API, or any online media

distribution system to reproduce (i.e. download) any of Plaintiffs' photos, to

distribute (i.e. cause to be displayed) any of Plaintiffs' copyrighted photos, or to

make any of Plaintiffs' photos available for distribution to the public, except

pursuant to a lawful license or with the express authority of each Plaintiff.

Defendant also shall destroy all copies of Plaintiffs' photos that Defendant has

downloaded onto any computer hard drive or server and remove the "embed

code" pointing to any Copyrighted photos from the internet or Instagram that Defendant has control or ownership interest in."

B.    For Plaintiffs to be awarded either: (i) Plaintiffs' actual damages and Defendant's profits, gains, or advantages of any kind attributable to Defendant's infringement of Plaintiffs' copyrighted photos; or (ii) alternatively, statutory damages of up to $30,000.00 per infringement or up to $150,000.00 for each instance of willful infringement of Plaintiffs' Copyrighted photos pursuant to 17 U.S.C. § 504.

C.    For Defendant to be required to account for all profits, income, receipts, or other benefits derived by Defendant as a result of its unlawful conduct.

D.    For Plaintiffs' costs and expenses in this action, including all reasonable attorney's fees incurred herein, pursuant to 17 U.S.C. § 505 and/or 17 U.S.C. § 1201 et. seq.

E.    For Plaintiffs to be awarded pre-judgment interest from the time of the infringements.

F.    For such other and further relief as the Court may deem just and proper.

Dated: This 22nd day of October 2020.

Respectfully submitted,

By: /s/ James Bartolomei Esq.
_____
James Bartolomei Esq.
Duncan Firm, P.A.
Of Counsel
809 W. 3rd Street
Little Rock, Arkansas 72201
501-228-7600 phone
501-228-0415 fax
james@duncanfirm.com

and

Bryan D. Hoben, Esq.
1112 Main Street
Peekskill, New York 10566
347-855-4008
914-992-7135 fax
<u>bryan@hobenlaw.com</u>

Attorneys for Plaintiffs